UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

**DAJUAN HOLMES-HAMILTON**, *et al.*,

    Plaintiffs,

v.

**FEDERAL BUREAU OF INVESTIGATION**,

    Defendant.

Case No. 21-cv-2927 (TNM)

---

<u>**MEMORANDUM OPINION**</u>

In 2019, several Americans died mysteriously on vacations in the Dominican Republic. Wanting answers, the decedents' kin filed FOIA requests for investigatory materials that Dominican law enforcement either shared with or requested from the Federal Bureau of Investigation. When the relatives did not get the answers they wanted, they sued. The FBI then produced several responsive records but withheld toxicology reports on the grounds that they contain information exempted from disclosure. The parties each filed for summary judgment. Those motions are now ripe. Because the FBI properly withheld the toxicology reports under the exemption for information compiled for law enforcement purposes, the Court will grant summary judgment in its favor.

I.

In May 2019, Cynthia Day and Nathaniel Holmes, both U.S. citizens, traveled to the Dominican Republic to celebrate their engagement. Compl. ¶ 3, ECF No. 1. Tragically, they were found dead in their room at the La Romana Resort "with copious amounts of frothy secretions around their nose and mouth." *Id*. ¶ 3; Decl. of Michael G. Seidel (Seidel Decl.) ¶ 39, ECF No. 34-3. Dominican authorities performed autopsies before their remains were returned to the United States. Compl. ¶ 3. At the request of local authorities, the FBI performed "routine

1

toxicology examinations" on blood and tissue samples.  Pl.'s Opp'n and Cross-Mot. for Summary Judgment (Opp'n), Ex. 6, ECF No. 36-6.  This included a toxicology pesticide examination, Ex. 9, ECF No. 36-9, and a volatile nitrogen and phosphorous screen, Ex. 10, ECF. No. 36-10.  These test results have not been publicly released.  *See* Seidel Decl. ¶ 42; Opp'n at 3.

A month later, Leyla Cox was found dead in her room at the same resort.  Compl. ¶ 4; Seidel Decl. ¶ 13 n.4.  Her body was not returned to the United States.  Compl. ¶ 4.  And blood samples taken following her death allegedly were lost en route to a private pathology laboratory.  *Id*.  The State Department has reported that the FBI performed toxicology testing on specimens from her remains.  *Id*.  Again, results from these tests have not been released.  *Id*.

The Plaintiffs here are the decedents' adult children.  In 2019, they submitted two FOIA requests to the FBI.  Seidel Decl. ¶¶ 6, 14.  The first request sought communications and investigatory materials stemming from the FBI's involvement in the investigation of Day and Holmes's deaths.  *Id*. ¶ 6.  The second request sought the same materials for Cox's death.  *Id*. ¶ 14.  Because both requests concerned the 2019 deaths of Americans at the La Romana Resort, the FBI administratively closed Cox's request and informed Plaintiffs that both their requests would be processed under the same request number.  *Id*. ¶ 13.

After receiving no responsive documents from the FBI, Plaintiffs sued in the U.S. District Court for the District of Maryland, seeking an order for the FBI to conduct a search.  Compl. ¶¶ 38–42; Seidel Decl. ¶ 21.  The case was later transferred here.  Seidel Decl. ¶ 25.

The FBI has since processed over two thousand pages of responsive records.  *Id*. ¶ 4.  At this point, Plaintiffs challenge only the FBI's decision to withhold 796 pages of toxicology test results.  *Id*.  Of those 796 pages, the FBI released four in full, 83 in part, and withheld the remaining 709 pages in full.  Seidel Decl. ¶ 51.  As a basis for withholding, the FBI invoked

2

Exemption 7(D), the confidential source information exemption, 5 U.S.C. § 552(b)(7)(D), and Exemption 7(E), the law enforcement techniques and procedures exemption, *id*. § 552(b)(7)(E); Seidel Decl. ¶ 5. Plaintiffs note, however, that their primary interest is in six pages of toxicology reports containing the actual test results for the decedents. Opp'n at 1. The remaining withheld documents contain ancillary information. *See* Pl.'s Statement of Undisputed Material Facts (Pl.'s SUMF) ¶ 16–17, ECF. No. 36-13.

## II.

"The vast majority of FOIA cases can be resolved on summary judgment." *Energy Pol'y Advocs. v. SEC*, 699 F. Supp. 3d 56, 61 (D.D.C. 2023) (cleaned up). To prevail, the moving party must show that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

Under FOIA, agencies must produce relevant requested documents "unless the documents fall within one of nine enumerated exemptions." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021). On summary judgment, the agency "bears the burden of proving the applicability of claimed exemptions." *ACLU v. DOD*, 628 F.3d 612, 619 (D.C. Cir. 2011). Typically, it does so through declarations or affidavits describing how the FOIA exemption applies to the information that the agency has withheld. *See id.*; *Shapiro v. DOJ*, 893 F.3d 796, 798 (D.C. Cir. 2018). The Court may grant summary judgment based solely on the agency's affidavits or declarations "if they contain reasonable specificity of detail . . . and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Aguiar v. DEA*, 865 F.3d 730, 734–35 (D.C. Cir. 2017) (cleaned up).

But even if an exception applies, an agency may not withhold materials unless it "reasonably foresees that disclosure would harm an interest protected by" a FOIA exemption, 5 U.S.C. § 552(a)(8)(A)(i)(I), and articulates "in a focused and concrete way, the harm that would result from disclosure, including the basis and likelihood of that harm," *Reps. Comm. for Freedom of the Press v. CBP*, 567 F. Supp. 3d 97, 110 (D.D.C. 2021) (cleaned up). "In sum, FOIA now requires that an agency release a record—even if it falls within a FOIA exemption—if releasing the record would not reasonably harm an exemption-protected interest and if its disclosure is not prohibited by law." *Ctr. for Investigative Reporting v. CBP*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019) (cleaned up).

### III.

The FBI withheld the requested toxicology reports under both Exemption 7(D), the confidential source information exemption, 5 U.S.C. § 552(b)(7)(D), and Exemption 7(E), the law enforcement techniques and procedures exemption, *id.* § 552(b)(7)(E). Because the information Plaintiffs seek was not "furnished by a confidential course," *id.*, Exemption 7(D) does not apply. But withholding is warranted under Exemption 7(E). Since the Bureau need only successfully invoke one of the two exemptions to win, the Court will grant it summary judgment.

### A.

To begin with, for either Exemption 7(D) or (E) to apply, the FBI must show that the withheld information was "compiled for law enforcement purposes." *Id.* § 552(b)(7). To do so, the FBI "need only establish a rational nexus between the investigation and one of the agency's law enforcement duties and a connection between an individual or incident and a possible security risk or violation of federal law." *Blackwell v. FBI*, 646 F.3d 37, 40 (D.C. Cir. 2011)

(cleaned up). "[A]n agency whose principal mission is criminal law enforcement will more often than not satisfy the Exemption 7 threshold criterion." *Pratt v. Webster*, 673 F.2d 408, 418 (D.C. Cir. 1982).

Plaintiffs claim that the toxicology reports were not compiled for a law enforcement purpose because an FBI representative said in an email that the Bureau was not currently investigating the deaths as a federal crime. Opp'n at 4. And in a later email, an FBI representative told Plaintiffs that the agency did not have an "open investigation" into Day's death but was merely "assist[ing] the Dominican authorities with their inquiries related to her death." *Id*. at 5; Opp'n, Ex. 2.

But Plaintiffs read Exemption 7's threshold requirement too narrowly. While the FBI itself may not have been investigating the deaths, it was aiding foreign authorities in their investigation. *See* Opp'n, Ex. 2. This satisfies the "nexus" requirement, especially considering that the statutory text of Exemption 7 "makes no distinction between foreign and domestic enforcement purposes." *Bevis v. Dep't of State*, 801 F.2d 1386, 1388 (D.C. Cir. 1986). In any case, where a law enforcement agency seeks protection of documents compiled for law enforcement purposes, the Court is "more deferential." *Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 203 (D.C. Cir. 2014). And given the toxicology reports were used for a "law enforcement purpose"—aiding in the investigation of mysterious deaths—the FBI is entitled to deference. So it satisfies Exemption 7's threshold requirement.

B.

Consider now whether the toxicology reports constitute confidential information. Exemption 7(D) protects two types of confidential information: (1) information that "could

5

reasonably be expected to disclose the identity of a confidential source"; and (2) "information furnished by a confidential source" in the context of a criminal or national security investigation. *Cobar v. DOJ*, 81 F. Supp. 3d 64, 72 (D.D.C. 2015) (quoting 5 U.S.C. § 552(b)(7)(E)). In other words, when an agency "receives information from a confidential source during the course of a legitimate criminal investigation . . . all such information obtained from the confidential source receives protection." *Parker v. DOJ*, 934 F.2d 375, 380 (D.C. Cir. 1991) (cleaned up).

FOIA does not define "confidential." *DOJ v. Landano*, 508 U.S. 165, 173 (1993). But the Supreme Court has held that "[a] source should be deemed confidential if the source furnished information with the understanding that the FBI would not divulge the communication except to the extent the Bureau thought necessary for law enforcement purposes." *Id*. at 174. The source's confidentiality may be express or inferred from context. *Id*. at 172. In either case, to justify the application of Exemption 7(D), "an agency relying on confidential sources should publicly explain to the extent it can why it has concluded that certain sources provided information under an express or implied assurance of confidentiality." *Montgomery v. IRS*, 40 F.4th 702, 712 (D.C. Cir. 2022) (cleaned up).

The FBI does not satisfy this requirement. In broad strokes, the FBI argues that Dominican authorities provided "information" to the FBI in confidence, and thus any information resulting from that exchange—such as the toxicology reports produced by the FBI— must also remain confidential. Def.'s Mot. for Summary Judgment (MSJ) at 7, ECF No. 34. Specifically, the FBI invokes Exemption 7(D) to "protect toxicology results that the FBI laboratory sent to the Dominican Republic after the Dominican Republic requested the FBI's assistance in a criminal investigation surrounding the deaths of several American tourists." *Id*. at 7; Seidel Decl. ¶ 43. According to the FBI, releasing any information exchanged between it and

Dominican authorities could make them reluctant to "collaborate with the FBI in the future and jeopardize the foreign government agencies' investigative techniques."  MSJ at 8.

Compelling though such concerns may be, the FBI fails to explain how the toxicology reports fit within Exemption 7(D)'s specific textual constraints.  To start, the identity and involvement of neither the FBI nor Dominican authorities have ever been "confidential."  The FBI was never bashful about its assistance to the investigation.  Nor did it try to conceal the role of Dominican authorities.  In response to a June 2019 inquiry into Day's death, an FBI employee openly acknowledged that the FBI was "assist[ing]" with the ongoing local investigation" and offered to provide a point of contact with the "Dominican authorities."  Opp'n Ex. 1, ECF No. 36-1.  Under no reading of Exemption 7(D) can the FBI claim that releasing the toxicology reports would somehow "disclose the identity" of a source that in fact was known all along.  *See* 5 U.S.C. § 552(b)(7)(D).

Though the Dominican authorities apparently requested that the FBI not disclose the information Plaintiffs now seek, Seidel Decl. ¶ 44, this does not necessarily make them a "confidential source."  It only reflects their wish that the information shared remain confidential.  But it is "confidential source[s]" and not, broadly, "confidential information" that the plain text of Exemption 7(D) protects.  5 U.S.C. § 552(b)(7)(D).[1]

---

[1] The FBI suggests that a source is "confidential" under Exemption 7(D) so long as the source "spoke with an understanding that the communication would remain confidential." *Landano*, 508 U.S. at 172.  But the FBI provides no authority that stands directly for this proposition.  True, courts in this district have held that the eventual public disclosure of a confidential source's identity does not preclude applying Exemption 7(D) to information furnished by that source. *See, e.g.*, *Cobar*, 81 F. Supp. 3d at 72 (concluding that "public disclosure of the identity of a confidential source does not waive Exemption D's applicability" to information furnished by that source).  It does not follow, however, that information furnished by a publicly known source is covered simply because the agency believes the information is sensitive and ought to remain confidential.

But even if the Dominican authorities were a confidential source, Plaintiffs are not seeking disclosure of information that they "furnished." They are seeking toxicology reports "furnished" by the FBI, which is clearly not a confidential source. Acknowledging this difficulty, the FBI argues that the toxicology reports are exempt under 7(D) because they are based on information furnished in confidence by the Dominican authorities. Seidel Decl. ¶ 43. But the FBI does not explain—even at a high level of generality—what information that it obtained in confidence would risk being disclosed if it were to release the toxicology reports.

Indeed, the FBI admits that the relevant information "furnished" by the Dominican authorities is publicly known. As part of its productions here, the FBI identified the samples it received from the Dominican authorities, which it then used to run its toxicology tests. *See* Opp'n Ex. 4, ECF No. 36-4; Ex. 5, ECF No. 36-5. The FBI claims these disclosures are "immaterial" because the FBI aims to protect the "results" of the tests that it "shared with the Dominican Republic on a confidential basis." Def.'s Resp. to Pl.'s SUMF ¶¶ 3–4, ECF No. 39-1. But, again, Exemption 7(D) is not a two-way street: it protects "information furnished *by* a confidential source," 5 U.S.C. § 552(b)(7)(D) (emphasis added), not information furnished *to* a confidential source. Because the FBI has not shown that disclosing the toxicology reports would reveal any non-public information furnished by Dominican authorities, Exemption 7(D) does not apply.

## C.

Turn now to Exemption 7(E). That exemption protects "records or information compiled for law enforcement purposes . . . [that] would disclose techniques and procedures for law enforcement investigations or prosecutions, . . . if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

Recall that the toxicology reports were compiled for law enforcement purposes. Toxicology reports count among "techniques and procedures for law enforcement investigations or prosecutions"—a conclusion Plaintiffs do not dispute. 5 U.S.C. § 552(b)(7)(E); Opp'n at 4. So the only question remaining is whether the disclosure of the toxicology reports "could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The Court finds that it does.

The bar for satisfying Exemption 7(E) is "relatively low." *Reps. Comm. for Freedom of the Press*, 567 F. Supp. 3d at 127 (cleaned up). "Any information that could increase the risks that a law will be violated will be protected from disclosure." *Id.* (cleaned up); *see, e.g.*, *Concepcion v. FBI*, 606 F. Supp. 2d 14, 43 (D.D.C. 2009) ("[D]isclosure of CIA security clearance and investigatory processes would risk circumvention of those processes in the future."); *Piper v. DOJ*, 294 F. Supp. 2d 16, 30 (D.D.C. 2003) (disclosure of polygraph test results would allow a criminal "to extrapolate a pattern or method to the FBI's questioning technique").

The FBI contends that releasing the toxicology reports would expose its lab's limitations. Seidel Decl. ¶ 48. The extent of the FBI Lab's testing capabilities is not publicly known. *Id*. And if it became public that the FBI could not test for certain chemicals during toxicology analysis, criminals could use that information to circumvent the law. *Id.*; *cf. Blackwell v. FBI*, 680 F. Supp. 2d 79, 92 (D.D.C. 2010) (exempting information related to procedures used to forensically examine computers on the ground that "disclosure potentially would aid others in circumventing future FBI investigations"). Someone plotting a poisoning would find it useful to know that the FBI tests for toxins X and Y but not Z.

More, disclosing the toxicology reports would reveal how the FBI aids criminal investigations by foreign governments. Seidel Decl. ¶ 49. According to the FBI's declarant, the results would show "exactly what information was requested from the lab, and what response was returned as a result of those requests." *Id*. This would provide criminals and criminal organizations insight into the FBI's "capabilities and vulnerabilities as they relate to coordination and information sharing with foreign partners." *Id*. "Understanding how the FBI does or does not obtain information from foreign partners . . . would enable criminals to predict FBI investigative tactics and develop countermeasures to avoid detection." *Sanders v. FBI*, No. 20-cv-3672 (ABJ), 2022 WL 888191, at *5 (D.D.C. Mar. 25, 2022).

Plaintiffs counter that the FBI laboratory's testing capabilities are already publicly known. Opp'n at 8. Not exactly. While the public knows the FBI conducts toxicological testing, "the capabilities of the FBI lab in performing these tests, and the specific substances the FBI can test for, is not publicly known." Def.'s Reply at 7, ECF No. 39; Seidel Decl. ¶ 48. And public knowledge that the FBI generally performs toxicological testing does not pose the same risk of circumvention as the release of detailed results, which might indicate which specific substances were screened and whether they were detected. *See* Seidel Decl. ¶ 48.

Plaintiffs also claim that the FBI has not adequately explained *how* disclosing the test results would reveal law enforcement techniques or risk circumvention of the law. Opp'n at 9. But the D.C. Circuit has rejected the notion that agencies must prove how the techniques will be disclosed or the law circumvented. "Rather than requiring a highly specific burden of showing how the law will be circumvented," the FBI need only "demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2009) (cleaned up).

At bottom, the FBI must show that disclosure of the exempted information would foreseeably harm "an interest protected by an exemption." 5 U.S.C. § 552(a)(8)(A)(i). To invoke Exemption 7(E), the FBI was "already require[d] . . . [to] show a risk of foreseeable harm." *Reps. Comm. for Freedom of the Press*, 567 F. Supp. 3d at 128. After all, "[t]he text of 7(E) allows withholding only when the withheld material 'could reasonably be expected to risk' circumvention of the law." *Id*. (quoting 5 U.S.C. § 552(a)(8)(A)(i)); *accord Callimachi v. FBI*, 583 F. Supp. 3d 70, 89 (D.D.C. 2022). And here, the FBI's declarant has explained that disclosure of the toxicology reports would "reveal limitations of the FBI Lab's testing abilities" in manner that "criminals could utilize to circumvent the law." Seidel Decl. ¶ 48. This counts as a "focused and concrete" explanation of "the basis and likelihood" of the potential harm from disclosure. *Reps. Comm. for Freedom of the Press*, 567 F. Supp. 3d at 110 (quoting *Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 370 (D.C. Cir. 2021)).

### D.

Finally, consider segregability. Even when an agency properly withholds records under one or more FOIA exemptions, it must still disclose any "reasonably segregable" information from those documents unless that information is "inextricably intertwined with exempt portions." *Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (citing 5 U.S.C. § 552(b)). To comply with this requirement, the agency must provide a "detailed justification" for any non-segregable information. *Id*.

The FBI has satisfied this requirement, and Plaintiffs do not argue otherwise. According to the FBI's declarant, the agency conducted a "page-by-page, line-by-line segregability review." Seidel Decl. ¶ 51. And it determined that, of the 796 pages remaining in dispute, four pages

could be released in full and 83 pages released in part, with non-segregable information redacted. *Id*. The remaining 709 pages required withholding in their entirety because the information was either covered entirely by a FOIA exemption or was so inextricably intertwined with exempt material that no information could reasonably be segregated for release. *Id*.

## IV.

For these reasons, the Court will grant the FBI's Motion for Summary Judgment and deny Plaintiffs' Cross-Motion for Summary Judgment. A separate order will issue today.

Dated: August 23, 2024                              TREVOR N. McFADDEN, U.S.D.J.